**In re COMPUTER OPTICS, INC., Debtor.**

**Bankruptcy No. 90–779.**

United States Bankruptcy Court, D. New Hampshire.

Feb. 6, 1991.

James M. Liston, Kaye, Fialkow P.A., Boston, Mass., for Shawmut Arlington Trust Co.

Robert W. Toan, New York City, for Angenieux, Inc.

Jennifer Rood, Backus, Meyer & Solomon, Manchester, N.H., for Computer Optics, debtor.

John Stanzel, Jay Niederman's Law Firm, Manchester, N.H., for Jay Niederman's Office.

Geraldine Brotherton, Thomas P. O'Neill, Jr., Boston, Mass., for UST Virginia Greiman.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This case presents questions of feasibility of a plan of reorganization, and "cramdown" treatment of a secured creditor's claim under the plan. The present dispute is the latest chapter in a pitched battle between the debtor in possession and the secured creditor, Shawmut Bank, N.A., from the time of the chapter 11 filing on May 11, 1990 through the plan confirmation hearings before this Court on November 21, 1990 and December 13 and 14, 1990.

■ The Bank, notwithstanding its oversecured position at the time of filing, and the fact that there was no default in payments prebankruptcy on the secured loan, has fought the debtor tooth-and-nail throughout the cash collateral usage hearings, the disclosure statement hearings, and at the evidentiary hearings on confirmation of the plan of reorganization.[1]

The Court during the course of the confirmation hearings issued bench rulings denying various and sundry objections to the confirmation put forward by the Bank, but left for final hearing and argument the question of the feasibility of the plan of reorganization and the question of whether restructuring the Bank's mortgage loans to a six year period on a consolidated basis under the plan with the same contractual rate of interest could be confirmed over the Bank's objection under the provisions of § 1129(b)(2)(A) of the Bankruptcy Code.

### Best Interests

■ While the Bank as an oversecured creditor does not have standing to raise the "best interests of creditors" requirement under § 1129(a)(7) of the Bankruptcy Code, i.e., whether the plan provides general unsecured creditors more than they would receive under liquidation of the debtor's assets net of liabilities, the Bank nevertheless objected to confirmation on this ground,[2] and the Court has an independent obligation to make findings with regard to the best interest requirement. The evidence before the Court in that regard establishes that the debtor's assets at liquidation would net approximately $593,000.00. The Bank's secured claim as of December 13, 1990, in principal and accrued interest, totals $535,754.59.[3] Accord-

---

1. A good part of the Bank's anger arises from the fact that the debtor allegedly got itself into a better cash position to start out the chapter 11 process by continuing to draw down revolving credit advances from the Bank during the period shortly before bankruptcy while at the same time discontinuing transmittal of receivable collections to the Bank. Assuming the Bank's allegations in that regard to be true, as the Court did in a bench ruling during the confirmation hearings, the breach of the contractual arrangements between the parties pre-bankruptcy would not constitute as a matter of law any lack of "good faith" in the actual post-petition preparation and presentation of a plan of reorganization to the creditors and the Court under the provisions of § 1129(a)(3) of the Bankruptcy Code. The Bank had no lockbox or other trust escrow arrangement with the debtor with regard to the revolving loan. Even if proven, those allegations would simply establish a prepetition breach of contract on the part of the debtor. While arguably a contention coming within the dismissal "for cause" provisions of § 1112, it has no legal relevance to § 1129 of the Code.

2. This objection to confirmation illustrates well the "tooth-and-nail" characterization of the Bank's reaction to this chapter 11 proceeding that the Court noted above. A number of the sundry objections rejected by bench rulings, referred to in the text above, also illustrate the Bank's implacable resistance to any attempt to fashion a consensual plan of reorganization in this case—to the extent of objecting to a lack of required provisions in the plan when the provisions in question clearly were included in the plan albeit not separately noted in the disclosure statement.

3. The Bank also claims an additional $24,602.40 for legal fees and other expenses paid to date with regard to its debt and claimed under its security interest. However, all such expenses, particularly legal fees, are not necessarily allowable under § 506 of the Bankruptcy Code unless determined to be reasonable. *In re Wonder Corp. of America*, 82 B.R. 186 (Bankr.D.Conn. 1988); *In re W.S. Sheppley & Co.*, 62 B.R. 279 (Bankr.N.D.Iowa 1986). For present purposes regarding the feasibility and cramdown ques-

ingly, at best, the unsecured creditors could expect to receive only some $57,-000.00 in distribution in liquidation. Since there are approximately $507,000.00 in unsecured claims, the maximum distribution in liquidation would be approximately 11.2 percent. The plan of reorganization provides for a distribution to general unsecured creditors of 35 percent. Accordingly, the plan clearly satisfies the best interest requirements of § 1129(a)(7).

*Feasibility*

The Bank contends on the feasibility issue that the projected payout of its secured debt over the six-year period, together with the payment of some 35 percent to general unsecured creditors under the plan, is not feasible, and that the debtor has failed to meet its burden of proof in that regard, in view of the history of this debtor's operations and its conduct and operations during the chapter 11. The Bank notes correctly that the debtor's profitability from its inception in 1985 has been low; that it posted a substantial loss in 1989; and that it has shown both operation and net losses during 1990 both before and after the filing of the chapter 11 petition.[4] The Bank also notes that following the chapter 11 filing the debtor has shown negative cash flows in a number of the succeeding months.

The debtor responds, and the record supports, that this chapter 11 proceeding is highly unique for the following reasons: (1) there had been no pre-petition defaults in payment to the Bank; (2) there were no IRS trust fund payroll taxes due either at or after the filing; (3) the debtor is current with the Bank debt except for certain payments that were withheld during the dispute with regard to cash collateral usage at the outset of the case; (4) the debtor historically has shown a collection rate of in

excess of 99 percent of its accounts receivable and can accordingly rely on its projections of such collections; (5) the debtor has held its present 30 employees from the time of its inception; (6) both the two controlling shareholders and the employees took substantial pay cuts prior to the bankruptcy filing; (7) the debtor has received an approved federal grant under the New England Trade Adjustment Assistance Center (hereinafter "NETAAC") which will result in some $55,000.00 being funded by the U.S. Department of Commerce under the NETAAC program to assist the debtor in improving the efficiency of its production and operational controls, and to aid in creating a more focused marketing approach for the debtor in its industry.[5]

The debtor produces commercial and industrial quality zoom lenses and other optical instructions and systems. The debtor has the capability of producing large telephoto lenses that interface into other electronic applications. The company's main strength is its technical capability. It is one of possibly two or three companies in the country that can provide full technology for military/aerospace applications of complex optical telephoto lenses. [transcript page 109] Lead times in preparing orders and collecting payment can be extensive in this operation. The evidence is consistent throughout the record that there are "plenty" of "small" contracts ($1 million or less) available to the debtor if it will properly focus its marketing and production in that area.

The debtor's real problems stem not from the quality of their products or market conditions but rather from other factors. First, they prematurely attempted without adequate working capital to shift their business operation from the lower

tions to be considered later, the Court will assume the secured claim to be the total of $560,-356.99, subject to the actual allowance of the Bank's claim under § 506 subsequently.

4. The debtor's operating loss for 1989 was approximately $150,000.00; their net loss in 1989 was approximately $217,000.00. For the period October 31, 1989 through July 31, 1990 the debtor had an operating loss of approximately $150,-000.00; and a net loss of approximately $192,-000.00.

5. NETAAC people spent approximately 100 hours doing the diagnostic review and analysis report on the debtor's operations and finances. The total estimated cost for the NETAAC project is $75,000.00, of which the federal government funds 74 percent and the debtor is expected to pay the other 26 percent.

profitability area of "manufacturing components" to the higher profitability area of dealing with "systems and assemblies" of complex optical products. In effect, they tried to make the shift with expenditures out of operations rather than by a new capital infusion, and therefore showed low or negative profitability prior to the bankruptcy filing. Second, an extraordinary event in 1989 occurred when arsenic leaked into the debtor's water wells and caused an etching of some optical work in progress that had to be abandoned at a cost of some $180,000.00, greatly contributing to the net operating loss for that year.[6]

The debtor's financial and operation history therefore presents the all-too-common present phenomenon in our economy of a business enterprise that can be organized with very little capital investment; that can proceed to become known and competitive in a desirable market area for its products; but that does not have sufficient working capital to cover unexpected negative events and/or sufficient working capital to take advantage of attractive positive opportunities.

The debtor's predecessor corporation was a French concern that produced zoom lenses in this country. The present two stockholders of the debtor, who previously had managed the French concern, ultimately were allowed to buy out the former company in a leveraged buy-out transaction. The name of the corporation was changed to Computer Optics, Inc., in 1985. After a successful 1986 year the debtor was able to obtain its present line of credit and secured borrowing from the Shawmut Bank in 1987. The debtor's two shareholders are individuals who have extensive skills and experience in developing complicated optical systems.

The debtor has historically averaged approximately 2.2 million dollars in sales. Its sales in 1989 were approximately $2,685,000.00. The sales for fiscal 1990 were approximately $1,900,000.00. The debtor's projected sales for fiscal 1991 under its plan are $2,721,843.00. The sales projections for fiscal 1991 were carefully and conservatively done, including calls and contacts with customers as to possible contracts, and review of past history with such customers. On balance, I find the sales projections realistic notwithstanding the sharp drop in sales in 1989–1990 period. The arsenic occurrence in 1989, the disputes with the Bank in 1990, and the natural disruption caused in the early stages of a chapter 11 proceeding explain that reduction as simply an aberration in the otherwise upward trend of sales experienced by the debtor in recent years. It is credible as the debtor's witnesses testified that approximately $500,000.00 in sales were lost during 1990 due to the disputes and litigation with the Bank and the chapter 11 filing. Those customers are available to continue to do business with the debtor once its financial condition is stabilized.

The debtor projects total cash expenditures for fiscal 1991 of $1,504,967.00, which include required debt service to the Bank under the plan of $127,154.00 and payments to the unsecured creditors under the plan. After deducting other expenditures for raw materials and outside vendors, equipment leases, and other miscellaneous items totalling $902,573.00 the projections leave net cash available for fiscal 1991 of $83,004.00. The projections for succeeding years build on those figures largely in line with historical trends. I likewise find those projections realistic and conservative.[7]

---

6. The debtor is on fiscal year accounting periods terminating on October 31st each year.

7. The Court discounts the 1990 "downturn" year in both sales levels and profitability, in that the extraordinary $180,000.00 loss from the arsenic problem in 1989 created working capital problems for the debtor that prevented it from taking full advantage of sales opportunities prior to the chapter 11, and sales were disrupted to some extent by the chapter 11 filing and the uncertainty attendant thereto. I believe it is credible as the debtor has contended, that it would have been able to hold onto an additional $500,000.00 in sales in fiscal 1990 but for those factors. Since those extraordinary events are not contemplated for the reorganized company, the Court believes the referenced conclusion in the text is justified.

In sum, the debtor made a strong showing in the confirmation hearing that with the aid of the professional advice and funds available under the NETAAC grant, and a refocused effort in its marketing targets and program, it should be able to reach the $2.7 million dollar level in sales in fiscal 1991, once the uncertainties with regard to its secured indebtedness picture and the chapter 11 proceedings are removed. The debtor has considerable skills available for its operations and considerable creditability in the market place. Its problems during the 1985–1989 period stemmed largely from the major extraneous factors set forth above, together with an unwise effort to go after much larger government contracts than it had the capability to handle, together with some management inefficiencies in handling inventory flow and production control matters. The record establishes that those matters are correctable and that a reorganized debtor should be able to avoid those distortions in its operations.

The debtor's plan and projections do not depend upon a new investor coming in to fund new products, although that is contemplated with the aid of NETAAC and other financial and technical experts the debtor has available for the purpose. The debtor has in progress the development of an infrared light zoom optical system that can be used with night vision products for military and space applications that could be a substantial profit center if additional funding for its development could be obtained.

The evidence before this Court indicates that if the debtor will keep its marketing efforts aimed at relatively small contracts (under $3 million dollars) it has the personnel and capability to establish for itself a profitable niche in the production of optical components and optical systems for commercial and industrial uses in this country. The market involved is approximately $10 billion dollars in scope and there are only two or three companies in this country

positioned as is the debtor to take advantage of that particular market. Moreover, although there is competition from the Japanese and other foreign suppliers, they cannot compete with regard to military or other contracts involving secrecy requirements.

■ The debtor's reorganization plan is admittedly a "boot strap" plan which projects the necessary revenues and retained earnings to fund the plan with no new capital infusion. The Bank has attacked the assumptions underlying the plan vigorously on all fronts, and makes cogent arguments from the debtor's past history to support its assertions.[8] However, on balance I believe that the evidentiary record before me establishes that once the debtor is freed from the distraction of a contentious chapter 11 proceeding, and has definitive debt service requirements over the projected period, the reorganized debtor should be able to meet its projected sales and expense targets and be able to fund the necessary plan payments. Accordingly, I will find and conclude that the plan is feasible and satisfies the § 1129(a)(11) test. The reorganized debtor should be able to fulfill all its obligations to its secured and unsecured creditors under the plan and is not likely to be liquidated or need further financial reorganization.

### *"Cramdown"*

■ The Bank contends that the treatment of its secured claim, and its restructuring under the plan, does not satisfy the fair and equitable standards and requirements of § 1129(b) of the Bankruptcy Code. The Bank points out that the plan not only extends the maturities of its respective loans by a year or more, and consolidates them, but also continues the loans at the same contract interest rate level that was in effect prior to bankruptcy, notwithstanding the greater risks involved.[9] The

---

8. The Bank's negative attitude regarding the debtor's future stems not only from the alleged occurrences shortly before the chapter 11 filing but also from the failure of the debtor to reach fairly lofty sales projection figures that it

presented to the Bank at the time of the 1987 loan transaction.

9. The Court has determined in a bench ruling during the course of the hearings that the Bank's contractual interest rate would be

Bank argues that it is being asked in effect to lend at nearly 100 percent of the collateral value involved, and that no Bank or lending institution would do that for a simple interest rate of 2 percent over prime, if they would do it at all.

The Bank produced a witness to testify on interest rates who has worked since 1988 as an independent consultant to lending institutions. The witness had been employed by Shawmut for the previous 20 years. The witness, Brian Elsden, testified that the appropriate interest rate for a restructured loan should take into account the specific risk factors pertinent to the loan, including the terms of the mortgage, the type of collateral available, and the history of the borrower's operations and the length of the term of loan. He indicated that no precise formula can be applied to determine appropriate interest rate but that all pertinent risk factors should be considered.

With regard to a somewhat sketchy hypothetical situation approximating the debtor's history and plan of reorganization, the witness testified an appropriate interest rate would be in excess of 20 percent. However, on cross examination the witness admitted that he did not review the changes proposed in the debtor's operations and marketing pursuant to the NETAAC study, and that he was not aware that the debtor had obtained the federal grant under the NETAAC program. When presented with an alternative hypothetical situation that excluded the effect of the 1989 extraordinary arsenic leaching event, and the disruptive effect of the chapter 11 on operations in 1990, the witness indicated

that an appropriate interest rate would be 2 to 6 percent over prime rates.

In reviewing the risk factors the Bank's witness testified that profitability, and not the projected sales volume, was the real issue and question with regard to the debtor. He stated that the debtor "expects all this growth to be financed by retained earnings when they have no history of doing that." He felt that the relatively small profits shown by the debtor during the 1986–1988 period was not much for a company of its size and raised significant risk questions for the future.

The problem with determining an appropriate rate for cramdown purposes under the approach presented by the Bank and its witness is that the "market rate" analysis applied in this fashion totally ignores the fact that we are by definition dealing with a *reorganized* debtor in which the focus should be upon the rehabilitated financial condition and financial prospects of the business enterprise involved. That is the goal and should be the result of the confirmation of a feasible plan of reorganization under the provisions of chapter 11 of the Bankruptcy Code.

■ The reorganized entity coming out of a chapter 11 proceeding should not, in my judgment, be saddled with all the past baggage of the pre-bankruptcy entity that obviously had to have serious and specific financial problems that caused its entry into the bankruptcy court. Reorganized debtors commonly have their general unsecured trade debt substantially reduced by the reorganization process and thus have a stronger financial condition than when they entered the Court proceedings. In the

deemed to be 2 percent over prime (as defined in the *Wall Street Journal* prime rate report) the same as the interest rate provisions for the Bank's restructured loan under the plan of reorganization. The evidence indicated that at the final hearing date the referenced prime rate was 10 percent and accordingly the interest rate under the plan of reorganization at that rate would be 12 percent.

The Bank's loan documents refer to a "base rate" variation which on testimony of the Bank's officers developed that the Bank took the position that it could raise or lower the interest rate in its own discretion with no contractual formu-

la involved. Notwithstanding the capitalization of the phrase "Bank's Base Rate" in the documents there is no reference or definition to indicate what it means. This unfettered discretion on the part of the Bank in my judgment would not be enforceable. The Bank witness testified that the Bank could raise the rate to 35 percent if it deemed that appropriate and that the debtor would be required under the contract to pay that interest rate without any appeal. The evidence before the Court is that the Bank has never imposed any base rate variation in the "2 percent over prime" formula used for this loan.

present case the debtor's general unsecured debt will be reduced to 35 percent of its former level. There would be little if any point to a chapter 11 proceeding if the reorganized entity coming out of the proceeding is forced to pay high interest rates stemming from the views of bankers as to what interest rate they would charge to make a secured loan to a company having the entire history of the debtor both before and after the bankruptcy filing.[10]

Moreover, the Bank's position on this question is largely bottomed upon their assertion that analysis must proceed from the viewpoint that the Court is dealing with a "coerced loan transaction" that must be evaluated in terms of like transactions in the general marketplace.

It will be useful at this point to note that the statute involved does not by its express language require such an analysis. Section 1129(b)(2)(A)(i)(II) simply provides that a secured claim that is to be paid over a period of time must under the plan "receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest ... in such property." The legislative history encompassed in the formal House Report dealing with this provision (in H.R. 8200 having the same language) states that the statute "contemplates a present value analysis that will discount value to be received in the future...." H.R.Rep. No. 595, 95th Cong., 1st Sess. 414–415 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6370. Collier on Bankruptcy comments with regard to this legislative intent that "The concept of 'present value' is of paramount importance to an understanding of § 1129(b). Simply stated, 'present value' is a term of art for an almost self-evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month, or a year hence." *5 Collier on*

*Bankruptcy,* paragraph 1129.02, page 1129–82 (15th Ed.1990).

It is therefore arguable that all that Congress intended by this statutory provision was to require that deferred payments of a secured claim be discounted down to present value by a discount rate that takes into account the time value of money in the current economy, as a general proposition, without engaging in any fact specific assessment of any additional risk premium attributable to the particular debtor whose financial affairs have been reorganized. See Scott, "Deferred Cash Payments to Secured Creditors in Cramdown of Chapter 11 Plans: A Matter of Interest," 63 *Wash. L.Rev.* 1041 (1988).

Notwithstanding the statutory language and the legislative intent indicated above, the case law with regard to an appropriate discount rate for cramdown purposes unfortunately has blossomed into a "many-colored splendor" of conflicting and sometimes indecipherable formulas as the courts have tried to implement the fact specific market analysis approach urged by the lender in the present case. See generally Carbiener, "Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate," 32 *South Dakota L.Rev.* 42 (1987).

Much of the confusion in my judgment stems from the additional reference in Collier to a "coerced loan" in this context which has skewed analysis ever since. Without citing any case or other authority that existed at the time, the Collier treatise in that comment took a quantum leap from the present value concept (in terms of the time value of money) into a totally different concept of a loan transaction involving fact specific risk analysis:

It is submitted that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by

---

**10.** If the question is to be presented in those terms it is not difficult to have "ten bankers in a row" testify under oath that they would not touch such a loan unless forced to, and if forced to would charge 20 percent or higher interest rate. The question when presented in that con-

text is of little aid to the reorganization court in determining an appropriate interest rate for cramdown purposes under both the language and underlying rationale of § 1129(b) of the Bankruptcy Code.

**672**

the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the "market" interest rate.

*5 Collier on Bankruptcy,* paragraph 1129.-03, page 1129–83 (15th Ed.1990).

Unfortunately, a great number of courts have followed the path of the "loan transaction" analysis "submitted" by the Collier treatise editors with the results indicated above. See, e.g., *In re Hardzog,* 901 F.2d 858 (10th Cir.1990); *United States v. Arnold,* 878 F.2d 925 (6th Cir.1989). The statute itself simply talks in terms of payment of a secured claim in full at the time of confirmation or, if deferred payments are to be made, the deferred payments must have a total amount in value equivalent to the immediate lump sum payment. Moreover, there is no "market" in the real world for "similar loans" when dealing with a reorganized entity coming out of a chapter 11 proceeding and it accordingly is not surprising that the case decisions taking such approach exhibit much conjecture and inconsistent results.[11]

It is instructive that one Court of Appeals has seen fit to move away from an earlier decision, in which it had approved the fact specific approach arising from the "coerced loan" analysis, toward a more generalized approach based on a simple time value of money analysis, using a riskless rate as a base, with a percentage adjustment upward to cover in general terms the "overall risk associated with a chapter 12 reorganization." *U.S. v. Doud,* 869 F.2d 1144, 1145 (8th Cir.1989). The Court in *Doud* affirmed a bankruptcy court decision

that took as the "riskless rate" the current rate of interest being paid on government treasury bonds of comparable duration to the debt repayment period under the plan provisions, with an additional 2 percent upward adjustment as indicated. The court cited other decisions that "adopted a prevailing market discount rate utilizing the yield on a treasury bond on a remaining maturity match to the average amount outstanding during the term of the allowed claim, plus a 2% upward adjustment to account for the risk." *Id.* at 1145. The Court cites, e.g., *In re Wichmann,* 77 B.R. 718, 721 (Bankr.D.Neb.1987); *In re Bergbower,* 81 B.R. 15, 16 (Bankr.S.D.Ill.1987).[12]

■ On balance, this Court is persuaded that the better approach is that taken in the *Doud* case and similar decisions that place the primary emphasis upon determining the appropriate riskless rate to reach the present value of the deferred stream of payments to the secured creditor, with an additional upward adjustment possible in an appropriate case to take into account any general risk attributable to the closeness of the decision finding the plan to be feasible.

■ In the present case, the evidence in the record at the time of the final hearing indicated that the current prime rate was 10 percent, which would give a current interest rate under the plan (being a variable rate of 2 percent over prime) of 12 percent. The evidence also indicated that treasury bonds of like maturity to the plan obligations (six years) were at an 8 percent rate. The plan accordingly provides an interest rate to the Bank on the deferred payments well in excess of a riskless rate

11. Collier itself in considering the equivalent cramdown provision in chapter 12 of the Code (farmer reorganizations) recognizes that many aspects of the "loan" being made under such a provision is unreal in terms of an actual marketplace, i.e., that "lenders do not make loans equalling 100% of the value of the collateral...." *5 Collier on Bankruptcy,* paragraph 1225.03, page 1225–22 (15th Ed.1990). Collier advises that the courts should ignore that fact. *Id.*

12. Two commentators have also concluded, after an exhaustive survey of the reported con-

flicting decisions on the matter, that the "riskless rate plus general percentage adjustment" approach adopted by a number of courts is the most sensible implementation of the statutory language and legislative intent underlying the cramdown provisions of the present Bankruptcy Code. See Carbiener, "Present Value in Bankruptcy: The Search for an Appropriate Cramdown Interest Rate." *32 South Dakota L.Rev.* 42 (1987); Scott, "Deferred Cash Payments to Secured Creditors in Cramdown of Chapter 11 Plans: A Matter of Interest," 62 *Wash.L.Rev.* 104 (1988).

for purposes of § 1129(b) of the Code.[13] Moreover, the debtor in the present case made a strong showing of feasibility in the plan hearings and therefore, to the extent that any upward adjustment for generalized risk stemming from the chapter 11 reorganization might be required, the 4 percent increase in rate over the riskless rate that the Bank will get under the plan is clearly sufficient in my judgment to cover any necessary upward adjustment for that purpose. Accordingly, the Court finds and concludes that the plan does meet the requirements of § 1129(b) of the Bankruptcy Code.

## CONCLUSION

The pending plan of reorganization is shown to be in the best interest of creditors and to be feasible within those mandatory requirements for confirmation under § 1129 of the Bankruptcy Code. With regard to the "cramdown" of the Shawmut Bank's secured lien position, the record with regard to the plan supports a finding that such treatment would be fair and equitable within the provisions of § 1129(b) of the Bankruptcy Code. Accordingly, the Court will enter an order confirming the pending plan of reorganization. The debtor shall prepare, circulate, and submit forthwith a proposed form of order in accordance with this Memorandum Opinion, covering all the required findings under § 1129, and shall also include therein or attach the specific note and mortgage provisions to be issued to the Bank by the reorganized debtor under the plan. If there is any dispute as to the form of the order in that particular regard the Court will hear the parties on an expedited basis.

---

**13.** The great majority of the reported cases to date, as summarized in the two law review articles cited above, have used an upward adjustment factor of 1 or 2 percent when using the riskless rate base approach.