**In re Arthur R. BEAUCHESNE, Debtor.**

**Bankruptcy No. 95–10524–JEY.**

United States Bankruptcy Court,
D. New Hampshire.

May 6, 1997.

M. Elaine Beauchesne, Sanders and McDermott, Hampton, NH, for Debtor.

J. Michael Deasy, Deasy & Dwyer, P.A., Nasha, NH, David D. Pavek, John K. Shunk, Messner, Pavek & Reeves, L.L.C., Denver, CO, for Creditor Beal Bank.

Geraldine B. Karonis, Manchester, NH, Asst. U.S. Trustee.

### MEMORANDUM OPINION ON THIRD AMENDED PLAN OF REORGANIZATION

JAMES E. YACOS, Chief Judge.

This Chapter 11 case is before the Court for confirmation of the debtor-in-possession's "Third Amended Plan of Reorganization dated March 1, 1996" (Court Doc. No. 91), and

an Objection thereto, filed by Beal Bank, SSB, a secured and unsecured creditor of this debtor (Court Doc. No. 94). This is a core proceeding in accordance with 28 U.S.C. § 157(b) over which the Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).

Mr. Beauchesne is an individual proprietor who operates a laundromat business and commercial and residential rentals in Somersworth and Newmarket, New Hampshire. He owns and operates thirty-two residential rental apartments in a building in Newmarket situated on four acres, and he owns an additional seven acres of undeveloped land in Newmarket. He also operates two commercial rental units and seven residential rental units in Somersworth and has a laundromat operation in the residential building. At the time of bankruptcy, Mr. Beauchesne's businesses had assets totaling approximately $1,168,359 and debts totaling approximately $1,340,000. Beal Bank is the holder of a first and second mortgage on the debtor's real estate in Newmarket, New Hampshire[1], and is the holder of a first mortgage on the debtor's real estate in Somersworth, New Hampshire.[2]

## PLAN PROVISIONS AND ISSUES

Under the plan, Beal Bank's secured claim on the Newmarket property of $840,000 is crammed down to $511,000, which is the un-

disputed value of that property, leaving a $329,000 unsecured deficiency claim upon which the debtor would pay 40 percent over the six years of the plan. The secured claim of $511,000 would be paid out over 10 years under the plan with interest at 8½ percent and with a final balloon payment of $417,847.[3] Beal Bank's secured claim on the Newmarket properties includes $110,000 that the bank paid for property taxes shortly before the bankruptcy filing.

Beal Bank's secured claim on the Somersworth property of $450,000 is crammed down to $320,000, leaving a $130,000 unsecured deficiency claim upon which the debtor would pay 40 percent over the six years of the plan. The secured claim of $320,000 would be paid over 25 years with a 9 percent interest rate with no balloon.[4] The plan only extends the existing notes that Beal Bank bought from the defunct bank (FDIC) by two to three years at the most, and does not significantly increase their original maturities.

The payout under the plan to unsecured creditors would include 24 initial payments of $500, totaling $12,000 in the first two years of the plan, and 48 payments thereafter of $1,898, totaling $91,104 for the next four years, with a final balloon payment of $34,361 in the last month for a total of $137,465, which would be a 40 percent distribution on the total unsecured claims, including the deficiency claims of Beal Bank. The debtor proposes to retain his interest in the properties in Somersworth and Newmarket, and proposes to exchange new value for these re-

1. Mr. Beauchesne obtained a first mortgage loan on the Newmarket properties in the original amount of $625,000 and a second mortgage loan in the original amount of $110,000 from Bank Meridian, N.A., which bank subsequently failed and was taken over by the Federal Deposit Insurance Corporation, from which Beal Bank purchased both of the debtor's Newmarket loans.

2. Mr. Beauchesne obtained a first mortgage loan on the Somersworth property in the original amount of $425,000 from The Somersworth Bank, which bank subsequently failed and was taken over by the Federal Deposit Insurance Corporation, from which Beal Bank purchased the debtor's Somersworth loan.

3. Specifically, the plan provides that Beal Bank will retain a lien for $511,000 and receive a

promissory note for deferred cash payments, such to be a 10–year note in the amount of $511,000 amortized over 25 years at an interest rate of 8.5% for monthly payments of $4,114.71 and a balloon payment of $417,847 after the 120th payment. *Debtor–in–Possession's Third Amended Plan of Reorganization dated March 1, 1996*, p. 7.

4. Specifically, the plan provides that Beal Bank will retain a lien for $320,000 and receive a promissory note for deferred cash payments, such to be a 25–year note in amount of $320,000 amortized over 25 years at an interest rate of 9% for a monthly payment of $2,685.43 for 300 months, with no balloon. *Debtor–in–Possession's Third Amended Plan of Reorganization dated March 1, 1996*, p. 7.

tained interests in the form of a $30,000 cash contribution from Mr. Beauchesne's wife and her contribution of a parking lot in Newmarket owned by her valued at $15,000.[5] The debtor's wife will commit to deeding the parking lot property by the effective date of the plan, pursuant to an oral stipulation made at the confirmation hearing.

The plan provides for the debtor to have monthly draws of $1,511, with increases of a maximum of 10 percent "and/or reasonable cost of living increases" each year during the six years of the plan. *Third Amended Disclosure Statement,* Art. VI, p. 30 (Court Doc. No. 90); *Plan Financial Projections. Draw to Arthur R. Beauchesne,* p. 3 (Exhibit B to Third Amended Disclosure Statement). Mr. Beauchesne's individual income and individual living expenses, including his personal income taxes, are not part of the plan projections, because they are a "wash". Beal Bank has not raised any issue about the debtor's personal income and expenses being a wash in this regard.

The issues presented are whether the "new value exception" to the absolute priority rule is available and satisfied by the provisions of the debtor's plan; whether the debtor's plan is feasible; whether the debtor's plan meets the cramdown requirements of section 1129 of the Bankruptcy Code; whether the debtor has "artificially impaired" the claims of certain classes to obtain the requisite votes in support of his cramdown plan; and whether the debtor's plan is in the best interests of creditors. For the reasons set forth below, the Court overrules Beal Bank's objection and confirms the debtor's Third Amended Plan of Reorganization dated March 1, 1996.

### CHRONOLOGY

The debtor filed a petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code on March 13, 1995. On May 3, 1995, Beal Bank filed a Motion to Dismiss the Case, as a bad faith filing, and on May 4, 1995 the Court ordered the debtor to file a plan by September 15, 1995. On May 10, 1995, the debtor requested cash collateral usage, which the Court allowed until September 15, 1995 by agreement from Beal Bank. On August 3, 1995, the Court denied Beal Bank's motion for dismissal, and on August 22, 1995 Beal Bank filed a motion for relief from the automatic stay. The debtor requested dismissal of Beal Bank's motion for relief on September 12, 1995.

The first plan of reorganization was filed on September 15, 1995, and after the first plan was filed the debtor filed a second motion to use cash collateral, to which Beal Bank objected. However, prior to the filing of the bank's objection, the debtor filed a second plan on October 23, 1995. On November 3, 1995, the Court denied Beal Bank's request for stay relief, but required Mr. Beauchesne to have the Somersworth property reconveyed to the bankruptcy estate by his son, Dana Coleman, to whom Mr. Beauchesne had transferred the property prepetition, and to report that such had been done by November 9, 1995. The reconveyance was timely reported to the Court, and the Court then granted the request for further cash collateral usage.

The debtor filed a third plan on November 17, 1995 and, after the third plan was filed, Beal Bank served the debtor with subpoenas and deposition notices, to which the debtor responded by filing a motion to quash. By Order of December 8, 1995, the Court denied the motion to quash, and also denied Beal Bank's oral motion for a 2004 exam. On December 27, 1995, the debtor filed a motion to approve a compromise with regard to the property taxes on the Newmarket properties, which the Court approved on February 2, 1996. On February 20, 1996, the Court denied confirmation of the debtor's third plan, and the debtor filed his fourth plan on March 1, 1996.[6] The Court conducted two days of

---

5. Her contribution of this property is a contribution of value but sale of the property may not be necessary. The debtor's projections do not include the proceeds of a sale of the property. The property is simply made available for sale if necessary to meet any unexpected shortfalls in operating or plan payment requirements.

6. For whatever reason, debtor's counsel found it appropriate to entitle the second plan the "First Amended Plan", the third plan the "Second Amended Plan", and the fourth plan the "Third Amended Plan", to the great consternation of the Court in its efforts to review the record and

evidentiary hearings on March 29, 1996 and June 24, 1996, and heard extensive oral arguments on June 26, 1996, and took this matter under advisement.

## DISCUSSION

### NEW VALUE EXCEPTION

As stated above, the debtor proposes to retain his interest in the properties in Somersworth and Newmarket, and proposes to exchange new value for these retained interests in the form of a $30,000 cash contribution from Mr. Beauchesne's wife and the parking lot in Newmarket valued at $15,000. Beal Bank objects to this proposal because the equity holders would be receiving something under the plan when the unsecured creditors are not being take out in full, and contends this treatment is a violation of the absolute priority rule under section 1129(b)(2).

■ The "absolute priority rule" requires that, for a plan to meet the fair and equitable test for confirmation, equity holders with interests that are junior to the interests of an impaired and dissenting class of creditors may only retain such interests if the impaired class is paid in full, and prohibits those with junior interests from receiving property "on account of such junior claims or interest" before those with more senior claims. 11 U.S.C. § 1129(b)(2)(C)(ii). A corollary or exception to the absolute priority rule is the so-called "new value exception", by which equity holders can retain an interest in property of the bankruptcy estate even if objecting senior creditors are not paid in full as long as the equity holders contribute "new value" to the reorganization effort. The "new value exception" was developed in caselaw interpreting the Bankruptcy Act. *See Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, *reh'g*

*denied* 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939).

This Court determines that the "new value exception" continues to exist under the current Bankruptcy Code notwithstanding any lack of express language to that effect. Bankruptcy Judge Vaughn has recently analyzed this issue, and this Court agrees and concurs with his conclusion based on the persuasive authority cited in Judge Vaughn's Memorandum Opinion. *See In re Waterville Valley Town Square Assoc.,* 208 B.R. 90, 98–99 (Bankr.D.N.H. 1997) (finding that the new value exception to the absolute priority rule exists).

### SUFFICIENCY OF NEW VALUE

■ The new value exception requires that the capital contribution by equity holders be "a fresh contribution", "in money or money's worth", that is "essential to the success of the undertaking", and that the equity holders only receive "a participation reasonably equivalent to their contribution". *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 121–122, 60 S.Ct. 1, 10–11, 84 L.Ed. 110, *reh'g denied* 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939). In this case, the new value would be $45,000.[7] In exchange for this "new value" contribution, the debtor would retain the fully encumbered Newmarket properties, the Somersworth property, the laundromat business and office equipment, and the cash on hand from operations.

As a preliminary matter, the Court determines that the infusion of new value is necessary to the viability of the debtor's reorganization plan. Beal Bank concedes this point. The new value will provide working money for plan payments and ongoing operating expenses for this debtor's enterprises to succeed. However, Beal Bank contends that the proposed infusion of $45,000 of new value into the reorganized debtor is insufficient to

assimilate the materials of this case in order to render a decision. As detailed in the foregoing chronology, the debtor actually filed four plans, and it is the fourth plan that is before the Court for confirmation.

7. The debtor estimates a minimum equity value for the parking lot of $15,000. The debtor's wife will commit to deeding the property by the effective date of the plan. The debtor, however, while

showing a sale of the parking lot by April of 1998, will not necessarily have to sell by then depending on operations but will have the lot available to either sell for cash or to include as part of an overall sale of the Newmarket property which might bring a better price for that portion as well. It is all contiguous property with the parking lot being the corner property.

meet the criterion of "substantial" or "reasonably equivalent to the value of the property retained".[8]

■ The Court concludes that the infusion of $45,000 of new value is sufficient and equivalent to the interests retained, regardless of whether this determination is made in relation to the treatment of the unsecured creditors, or whether it is made in relation to the debtor's position at the conclusion of the plan. If sufficiency is measured in terms of comparing the total unsecured debt of $343,619 to the $45,000 of new value, which is 13.10 percent of the unsecured debt, then the Court finds the $45,000 to be a sufficient and reasonable amount to balance the debtor's position against the unsecured creditors' positions, which is the focus of the absolute priority rule in this context.

If sufficiency is measured in terms of comparing the $61,746 in cash, which the plan projections indicate the debtor will end up with at the end of the sixth year of the plan, to the $45,000 in new value, then the Court again finds this to be a sufficient and reasonable amount for the debtor to pay for his retained interest in these properties.[9] It is conceded that currently there is no equity in any of the real property, and the values of the laundromat and the debtor's other operations are dependent upon the debtor's experience and continued involvement in management and relations with customers, the community, and suppliers, which do not give the properties values that could be easily marketed by creditors if the plan were to be denied confirmation.

■ Beal Bank contends that the $45,000 should be compared to the total debt in the case of $842,000, and notes that the new value is only 5.3 percent of that total debt. However, this approach seems illogical, because the test itself pertains only to the relation between equity holders and unsecured creditors. See 11 U.S.C. § 1129(b)(2)(B).

## FEASIBILITY

■ The Court finds that the record, particularly the testimony of the debtor's witness, Nancy Oronte, supports the debtor's plan projections. Ms. Oronte has been an accountant for 18 years, has an MBA degree, is an enrolled agent licensed to practice before the IRS, and impressed me as quite knowledgeable. She was Mr. Beauchesne's accountant pre-petition for seven years. Ms. Oronte focused on specific numbers in her projections, which I believe supports a finding by the preponderance of the evidence that the debtor will be able to perform the plan as proposed, and will not have to seek "liquidation or . . . further financial reorganization" after confirmation. See 11 U.S.C. § 1129(a)(11).

Ms. Oronte testified that, if the debtor could obtain 70 percent financing, the Newmarket property would have to be worth $597,000 to finance the entire $417,847 balloon payment. That increase in value would be from $511,000 to $597,000 in 10 years, or an increase of approximately 16 percent over the 10–year period, representing on average a 1½ percent increase in property value each year. The debtor's evidence is uncontradicted and supports a finding that values of property in the Newmarket area are rising and can be expected to cover that amount of increase in value over the period involved. If the debtor were able to obtain 80 percent financing on the Newmarket property, the property would only have to increase from $511,000 to $522,000 to cover the amount necessary for the balloon payment. It seems to me that those assumptions are reasonable and the debtor should be able to refinance the entire balloon payment at the end of that time, because he would have some $62,000 at the end of the plan payments on the unsecured claims, after six years, and will have

---

8. The *Los Angeles Lumber* case requires that new value be both necessary and sufficient and Beal Bank argues that the latter requirement means that this business should be given enough working capital to get through the first few years of the plan and asserts that it is not.

9. While the debtor will take out approximately $139,000 in compensation over six years, that is not an appropriate factor *per se* on the "new value" test, unless it were shown that the compensation would exceed the value of his services. No such showing was made here. He is going to have to work hard in all three businesses.

the other plan debt service terminated to free up an additional $150,000 before the 10–year balloon must be paid.

During the period from April of 1995 to the present, under Court Order, the debtor has been paying an average of $7,123 a month to Beal Bank in adequate protection on its Newmarket and Somersworth secured claims. During the course of the plan the debtor would have to pay $6,800 a month (adding the $4,415 on Newmarket to the $2,685 on Somersworth), so in that respect the debtor has already been meeting, if not exceeding, the plan projections. The debtor has also, during the pendency of the reorganization case, been escrowing sufficient funds ($1,547 per month for the Newmarket property, and $1,260 per month for the Somersworth properties) for the payment of property taxes. All property taxes have been kept current during the course of this case, and the debtor has no unpaid tax claims and has not had any tax problems in his businesses.

The events that caused the debtor financial hardships that necessitated the bankruptcy filing are not likely to reoccur during the plan period. The debtor was caused to seek bankruptcy relief by the economic recession in the late 1980's. The debtor was brought into Court primarily because of the recession which dropped rents substantially. This case is somewhat akin to *In re Computer Optics, Inc.*, 126 B.R. 664 (Bankr.D.N.H. 1991), in that there were extraordinary events in the business recession in the late 1980's, coupled with a substantial increase in property taxes on one of the properties, which were extraordinary events. There is no basis to infer that those events will hamper the debtor's future operations.

The debtor never went into default with Beal Bank on the Somersworth property, and was "pretty much out of the woods" on the Somersworth property before the bankruptcy filing. The Newmarket property, however, had more severe problems, and the debtor serviced some $735,000 worth of debt after buying out his partner in 1988 until the end of 1990. The debtor's income in Newmarket

dropped significantly as the business recession in New Hampshire intensified. The Newmarket property also was hit by a significant increase in property taxes which ultimately, during the course of the reorganization case, resulted in a tax abatement and refund of some $13,000. The debtor has also realized a reduction of $10,000 per year in property taxes as a result of the reduction in his taxes in the Newmarket property.

The debtor seems to have addressed, with counsel and with his accountant, Nancy Oronte, the details of his three business operations realistically, based on past experience and foreseeable future operations. A comparison of the debtor's projected gross revenues and gross expenditures with the debtor's actual gross revenues and gross expenditures for the period from May of 1996 through March of 1997 [10] indicate that the debtor is performing above the projections. *See Comparison of Plan Projections & Actual Results,* attached hereto as Annex "A".

The plan projections on an "operating basis" show a negative cash flow for the first twelve months but, because of the initial injection of the $30,000 from Mrs. Beauchesne and the $13,000 from the property tax refund, the actual cash flow is positive. The debtor's projections seem realistic and take into account appropriate increases in expenses each year, as well as relatively modest increases in rental and other revenues.

In my judgment, the debtor has demonstrated a hands-on knowledge of his real estate and other business investments in the area, by his past experience, and has impressed the Court as being willing to work as hard as necessary to make sure the plan is performed as proposed. The debtor's three business operations (a 32–unit apartment building, including over seven acres of adjoining land; a commercial building that has seven residential units and two commercial units; and a laundromat operation) should be looked at together, because they are interrelated both operationally and financially.

**10.** This data comes from the debtor's continuing operating reports to the U.S. Trustee, of which the Court takes judicial notice.

The debtor experienced considerable turmoil and problems with employees at the laundromat in the past, and intends to convert the laundromat to a "self-serve" operation with no employees but with a more expanded change machine that can handle denominations up to twenty dollars. In addition, the debtor has done a lot of renovation and repair work on roofs, etc. before and during the course of the bankruptcy proceeding, and the properties are currently in much better condition and should be able to attract and hold a better class of tenants. The debtor has limited himself to monthly draws of $1,511 with a maximum 10 percent increase each year during the six years of the plan. *See Third Amended Disclosure Statement*, Art. VI, p. 30 (Court Doc. No. 90); *Plan Financial Projections, Draw to Arthur R. Beauchesne*, p. 3 (Exhibit B to Third Amended Disclosure Statement).

Beal Bank contends that the debtor's own projections show that the business operations have a negative cash flow of $42,000 during the six years of payments to unsecured creditors, but I believe that only occurs if you ignore the infusion of funds at the outset, including the initial cash available and the $30,000 cash contribution from Mrs. Beauchesne, and only look at the business operations in a vacuum, which is illogical and unrealistic. Beal Bank further contends that its Exhibit 106 and the testimony of Mr. DuBois show an additional $45,000 of negative cash flow from operations over the six years of the plan if you adjusted the numbers to take into account the 12 months of actual operations pre-May 1996. According to Beal Bank, the debtor's projected net cash balance of approximately $62,000 at the end of the six-year plan would actually only be $17,000, if reduced by $45,000 in accordance with Mr. DuBois' testimony. Beal Bank notes that the debtor's projections indicate total gross revenues of $2.1 million, and that $17,000 is only one-quarter of one percent, which leaves very little margin for error.

My reaction to the testimony and evidence is that the debtor's projections have not been seriously attacked by the contrary testimony of Beal Bank's witness, Richard E. DuBois, who was highly theoretical and generic in nature and did not, in my judgment, address the projections and showing made by the debtor in a way that would challenge those projections and evidence in any substantial way. Mr. DuBois' testimony was highly confusing, primarily because he was mixing concepts based upon assumptions for *liquidation* analysis, for purposes of determining the best interests test, with projections for future *performance* under the plan. The Court expressed its inability to understand Mr. DuBois' testimony in this regard, and its irrelevance to projections for the future, in the colloquy with counsel for Beal Bank. *Transcript*, pp. 52—59 (June 26, 1996). The record was also confusing, because the questions in cross examination of Ms. Oronte mixed up future projections with the numbers used in the liquidating analysis in the disclosure statement. *Transcript*, pp. 122–123 (March 29, 1996).

Mr. DuBois testified that the debtor's projections did not show any tax impact and that "there may be a tax impact", and it is true that neither Ms. Oronte nor the debtor have really analyzed any increasing tax liabilities to the debtor personally since this is an individual debtor case. The trial testimony by Ms. Oronte did indicate that the possible tax increase per year was relatively small and could probably be covered out of Mr. Beauchesne's personal income and depreciation factors. Specifically, Ms. Oronte noted that Mr. Beauchesne has been paying the taxes out of his personal income, and has assumed that a depreciation deduction of up to $20,000 to $30,000 a year would be sufficient to cover any increasing taxes. Mr. DuBois' testimony was not specific in dollars and cents, and he conceded that he has not done a tax impact analysis himself, but just noted the question. I do not find the tax question sufficient to bar a finding of feasibility by the preponderance of the evidence standard applicable to the issue.

### CRAMDOWN

The debtor's cramdown of Beal Bank's claims over the bank's objection in accordance with section 1129(b)(2) is supportable in this case, because the record supports a finding that the bank is receiving the

amount of its secured claim, the value of the properties (which has been stipulated at $511,000 for Newmarket, and $320,000 for Somersworth), at interest rates that will equate the debtor's payments over the term of the plan to the present value of the properties, taking into consideration the riskless rate on comparable U.S. Government securities with an appropriate additional risk factor increment. *Cf. In re Computer Optics, Inc.,* 126 B.R. 664 (Bankr.D.N.H.1991). The plan also provides for the Bank to retain its liens on the properties in question.

■ With regard to the Newmarket property, Beal Bank argues that the cramdown on that property is not permissible for a special reason, i.e., neither the plan nor the proposed confirming order gives the bank a lien on the debtor's property in a complete form that includes both a lien position on the Newmarket real property *and* a lien for the net rental stream. The bank argues that its second mortgage on the Newmarket properties provides that it covers rents as well as the property, and Beal Bank therefore contends that they have to have separate lien protection on the Newmarket rents post-confirmation. This objection to the debtor's plan fails. The bank did not have any pre-default lien rights on the debtor's rents before bankruptcy, and it should not have any such pre-default rights post-bankruptcy as long as the debtor performs his plan obligations to the bank. The bank will have a lien upon rents post-confirmation when, and if, there is a default on the performance by the debtor under its plan obligations with regard to its secured claim and when, and if,

the bank can assert that right under New Hampshire state law.

In a bench ruling during the confirmation hearing on February 2, 1997 regarding the debtor's third plan (the "Second Amended Plan of Reorganization"), this Court overruled Beal Bank's objection to the debtor's plan on the "rents" lien issue. Specifically, the Court ruled that Beal Bank's objection based on the failure of the debtor's plan to cover rents was overruled, inasmuch as section 1129(b)(2)(A)(i)(I) controls this issue and requires the plan to provide, as it does[11], that Beal Bank will retain the same liens as it had on the date the bankruptcy petition was filed. *Cf. In re Rancourt,* 123 B.R. 143 (Bankr.D.N.H.1991) (mortgagee with a security interest in rents can do nothing to enforce interest until there is a default in payment on the mortgage and mortgagee has taken over possession and control of property).[12] That bench ruling is incorporated herein by reference, and to the extent that Beal Bank is raising that issue again, with regard to the debtor's fourth plan ("Third Amended Plan"), their objection is again overruled.

### ARTIFICIAL IMPAIRMENT

The only impaired class accepting the debtor's plan is Class 4[13], which is comprised of water and sewer charges of $1,005 owed to the City of Somersworth. The plan provides that the City will be paid $17 a month for six years. The bank objects and contends that this is an "artificial impairment" in contravention of the provisions of section 1129(a)(10) of the Bankruptcy Code. The debtor responds that the plan impairs the

---

11. *Third Amended Plan of Reorganization dated March 1, 1996,* p. 7, ¶ 3.5 (Court Doc. No. 91) ("With respect to the Beal Newmarket Loans, Beal shall retain its liens for $511,000 ... ").

12. As noted in the *Rancourt* decision, while *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) requires state law to be applicable with regard to property interests generally, it does not require that the secured party have *greater* rights post-confirmation than it had before the filing of the case. The confirming order will indicate that to the extent that the bank had rights to reach the rents pre-bankruptcy, it will have the same rights on default post-confirmation, but no more.

13. The Court made a bench ruling that Class 2 would not be counted as a vote of acceptance, because it was indicated that the debtor might have inadvertently paid that claim during the course of the reorganization proceeding. The Court did determine that Class 4 would be considered as an impaired class voting in favor of the plan, and rejected once again the effort by Beal Bank to have it reconsider its prior bench ruling holding that because the Class 4 creditor had originally voted to accept the plan the purchase by Beal Bank of that claim would not be permitted to destroy that acceptance after the fact.

"other similarly situated class", Class 3, in exactly the same way, and had the debtor not done so then he would have been unfairly discriminating between creditor classes in violation of section 1129(b)(1). Class 3 is the claim for unpaid taxes of $11,139 owed to the Town of Newmarket, upon which the debtor proposes to pay $190 a month for six years.

Section 1129(a) (10) of the Bankruptcy Code provides that a plan can be confirmed when, *inter alia,* "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). This statute literally allows any impairment to qualify, and does not specify a degree of impairment in terms of the magnitude of the impairment or of the claim. Where there is no ambiguity in the statute, federal courts normally will not interpose equitable qualifications that the legislature has not explicitly put in the statute. *Cf. United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (plain meaning of statute governs). The Court will not inject into the statute concepts of "manipulation" not added to the statute by Congress. The debtor satisfies the requirements of section 1129(a)(10), and the bank's objection on this point is overruled.[14]

To the extent that the bank argues that the good faith requirement of section 1129(a)(3) could be read to in effect overrule section 1129(a)(10), the Court also rejects that contention. Once it is determined that section 1129(a)(10) is satisfied, it is not appropriate or permissible to use the generalized good faith requirement in section 1129(a)(3) to in effect override that determination.

### BEST INTERESTS

The unsecured creditors will get a 40 percent dividend under the plan payout. There is no question that they would get nothing approaching that dividend if these properties were liquidated. The best interest issue has not been presented by the bank or by any other creditor, and the Court rules that it is quite clear that the debtor's plan is in the best interests of creditors pursuant to section 1129(a)(7)(A)(ii).

### ADDITIONAL PROVISIONS

The debtor agreed at the confirmation hearing to additional provisions that the Court would require before confirming the plan and those provisions will be added to the confirming order. The debtor agreed to the following provisions:

"As a condition of confirmation, on or before the Effective Date of the said Plan, the Debtor's wife, Odile Taylor Beauchesne, shall deed (subject to the Gagnon mortgage) to the Debtor, for his use in execution of the said Plan, her North Main Street, Newmarket, New Hampshire parking lot;

The said Plan is also hereby further amended to state that, between confirmation and completion of the Plan, Mr. Beauchesne shall devote his pension and owner's draw income to execution of the Plan to the extent necessary. This provision reflects the reality of what the Debtor has always been doing—using his pension and draw income and his personal accounts (as shown on his U.S. Trustee Monthly Operating Reports) to pay his income tax liabilities; and

Pursuant to this Court's prior rulings and stipulations on the record, (a) Beal Bank shall retain under the Debtor's Third Amended Plan of Reorganization dated March 1, 1996 the same liens on the Newmarket rents as it had on the Petition Date, and (b) Beal Bank shall have no additional rights to post-confirmation segregation or payment over of those rents."

---

**14.** Inasmuch as the debtor is devoting his pension income and his so-called "fresh start income" in his personal accounts (which he agreed to commit to the plan vis-a-vis the confirming order), the application of the absolute priority rule is the real protection for the secured creditor, rather than reading "artificial impairment" or a minimal impairment requirement into section 1129(a)(10).

## CONCLUSION

In accordance with the foregoing, the Court holds that the record supports a finding and conclusion that the debtor's Third Amended Plan of Reorganization dated March 1, 1996 (Court Doc. No. 91) satisfies the requirements for confirmation as provided in Section 1129 of the Bankruptcy Code. Beal Bank's objection is therefore overruled and the debtor's third amended plan will be confirmed by a separate Order to be entered this date.

### In re Arthur R. Beauchesne
### Bk. No. 95–10524–JEY
### COMPARISON OF PLAN PROJECTIONS & ACTUAL RESULTS

| Date | Gross Revenues | | Gross Disbursements | |
| --- | --- | --- | --- | --- |
| | Projected | Actual | Projected | Actual |
| May 1996 | 27,596 * | 37,416 | 28,157 * | 26,852 |
| June 1996 | 27,596 | 35,528 | 28,157 | 28,256 |
| July 1996 | 27,596 | 28,973 | 28,157 | 24,897 |
| Aug. 1996 | 27,596 | 31,234 | 28,246 | 23,340 |
| Sep. 1996 | 27,596 | 31,489 | 28,157 | 27,282 |
| Oct. 1996 | 27,596 | 32,606 | 26,157 | 27,657 |
| Nov. 1996 | 27,596 | 28,836 | 28,246 | 28,546 |
| Dec. 1996 | 27,596 | 31,421 | 28,157 | 29,589 |
| Jan. 1997 | 28,040 | 39,336 | 28,448 | 31,161 |
| Feb. 1997 | 28,039 | 31,229 | 28,537 | 29,948 |
| Mar. 1997 | 28,039 | 33,257 | 28,448 | 28,197 |
| Apr. 1997 | 28,039 | | 28,448 | |

---

\* Items relating to assumed plan revenues and expenses that would have occurred had the plan been confirmed in May of 1996 are excluded from these numbers for purposes of this tabular summary. The debtor's Plan Projections actually show gross revenues of $57,596 for May 1996, however when extraordinary "plan" items are excluded, this is the accurate projection. The debtor's Plan Projections actually show gross disbursements of $100,499 for May 1996, however that amount anticipated payment of legal/administrative fees of $70,000 under the Plan, and when $70,000 is deducted, this is the remaining amount projected.